IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| JNS AVIATION, INC., JNS AIRCRAFT SALES, LLC, J. MALCOLM SHELTON, IV, and JAMES N. SHELTON,<br><br>Appellants,<br><br>v.<br><br>NICK CORP.,<br><br>Appellee. | §§§§§§§§§§§§<br><br>NO. 2:08-CV-130-J |

## MEMORANDUM OPINION AND ORDER

Before the Court is the above styled bankruptcy appeal. The findings and conclusions of the bankruptcy court are AFFIRMED.

### BACKGROUND[1]

This appeal arises from an adversary proceeding in the bankruptcy court. The present litigation arises from a dispute involving the purchase of a Beechcraft King Air 200 airplane. Since 1989, James Shelton (Jim Shelton) and his brother Malcolm Shelton have operated their own airplane business which specializes in refurbishing and reselling used airplanes. This business was originally operated under the name JNS Aviation, Inc. The business was converted into a limited liability company in 1999, becoming JNS Aviation, LLC. The entity will hereinafter be generally referred to as JNS Aviation.

In 2001, Nick Lopardo (Lopardo) traveled to Amarillo, Texas to meet with Bill Arnwine (Arnwine), an airplane broker. Lopardo and Arnwine reviewed four aircraft being sold by Jim

---

[1] A detailed factual background is laid out in the bankruptcy court's first opinion: *In re JNS Aviation, LLC*, 376 B.R. 500, 506-20 (Bankr. N.D. Tex. 2007).

Shelton. Ultimately, Lopardo purchased one of those aircraft, a Beechcraft King Air 200 airplane with the serial number "BB-595" (hereinafter BB-595). The back-and-forth bargaining that culminated in Lopardo's purchase of BB-595 is discussed thoroughly by the bankruptcy court below.

The fact that BB-595 had twenty-five years of missing engine logs and had been owned and held outside the United States for many years concerned Lopardo. Additionally, Lopardo stated that he might decide to purchase a larger plane in the near future, and was not sure how long he would want to keep BB-595. In order to accommodate these issues, JNS Aviation offered a buyback provision as part of the purchase agreement.

Arnwine prepared the contract for the sale. The contract, titled "Purchase Agreement," is dated April 6, 2001. It recites on the first page that JNS Aviation is the "Seller" and Kahuna Partners III, LLC, a Massachusetts corporation, is the "Purchaser." At the time of sale, legal title to BB-595 was held by JNS Aviation, Inc. Though Lopardo signed the Purchase Agreement, along with other documents, on behalf of Kahuna Partners III, LLC, it was later discovered that Kahuna Partners III, LLC never existed. Lopardo testified that he first became aware of this a few months prior to trial.

The purchase of BB-595 closed in Delaware on May 11, 2001, and Jim Shelton flew the aircraft to Delaware to deliver it to Nick Corp. In accordance with the terms of their agreement, Nick Corp., a corporation wholly owned by Lopardo, paid JNS Aviation $1,903,748 and received delivery of BB-595.

Lopardo did not elect to keep BB-595 long – several problems with the plane developed. Lopardo notified Shelton of the problems and the two exchanged e-mails, extensively detailed in

the bankruptcy court's opinion, over a period of time during which they initially tried to work things out but could not.

In April 2002, Lopardo filed suit for breach of contract in Delaware, where the purchase transaction took place. JNS Aviation did not respond to the suit and default judgment was entered in favor of Nick Corp against JNS Aviation. On May 30, 2002, between the time of filing of the Delaware suit and the entry of default judgment, Jim and Malcolm Shelton formed JNS Aircraft Sales. By early June 2001, the Sheltons had transferred the assets of JNS Aviation to themselves personally as members of JNS Aviation. The Sheltons then later transferred those assets to JNS Aircraft Sales.

In February of 2004, Nick Corp. filed suit in the United States District Court for the Northern District of Texas, Amarillo Division, asserting claims for fraud, fraudulent transfer, piercing of the corporate veil, and breach of fiduciary duties. In September of 2004, JNS Aviation voluntarily filed for bankruptcy under chapter 7. Nick Corp.'s lawsuit was thereafter referred to the United States Bankruptcy Court for the Northern District of Texas as an adversary proceeding. This appeal contests issues involved in that adversary proceeding that were decided in favor of Nick Corp.

## STANDARD OF REVIEW

In reviewing a decision of the bankruptcy court, this Court functions as an appellate court, applying the standards of review generally applied in federal courts of appeal. *See Matter of Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992); *Matter of Coston*, 991 F.2d 257, 261 n. 3 (5th Cir. 1993) (en banc) (*citing Matter of Hipp, Inc.*, 895 F.2d 1503, 1517 (5th Cir. 1990)). Conclusions of law are reviewed *de novo,* while findings of fact are not to be set aside unless clearly erroneous. *See* Bankruptcy Rule 8013; *see also Matter of Herby's Foods, Inc.*, 2 F.3d

128, 130-31 (5th Cir. 1993). A finding is clearly erroneous and reversible only if, based on the entire evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been made." *Id.; Matter of Allison*, 960 F.2d 481, 483 (5th Cir. 1992). In conducting its review, the Court remains "particularly mindful of the opportunity of the bankruptcy judge to determine the credibility of the witnesses." *Matter of Young*, 995 F.2d 547, 548 (5th Cir. 1993) (*quoting* Rule 8013).

## DISCUSSION

Appellants assert five separate points of error in the bankruptcy court's decision. First, Appellants claim the bankruptcy court committed error when it found Nick Corp. had standing to pursue certain claims. Second, Appellants argue that the bankruptcy court committed error when it pierced the corporate veil to hold JNS Aircraft Sales, Jim Shelton, and Malcolm Shelton individually liable for the debts of JNS Aviation. Third, that the bankruptcy court committed error in finding fraudulent inducement. Fourth, that the bankruptcy court committed error by denying Appellants due process by refusing to allow them to attack a previous default judgment. Fifth, Appellants claim that the bankruptcy court committed error in calculating its final judgment.

## I. NICK CORP HAS STANDING TO PURSUE ITS CLAIMS

Appellants assert that the bankruptcy court committed an error of law by entering a judgment in favor of Nick Corp., arguing that Nick Corp. lacks standing to bring a veil-piercing claim because such claims are property of the bankruptcy estate. Appellants further assert that the bankruptcy court committed a clear error of fact in finding that Nick Corp. has standing under the Purchase Agreement because there was no evidence or insufficient evidence at trial to

prove that the rights under the Purchase Agreement were assigned to Nick Corp. Both claims are incorrect.

In support of their contention that veil-piercing claims are property of the bankruptcy estate, Appellants rely on *Matter of S.I. Acquisition, Inc.* 817 F.2d 1142 (5th Cir. 1987). In *S.I. Acquisition* the Fifth Circuit, applying Texas law, held that alter ego claims brought by a creditor against nonbankrupt codefendants were automatically stayed under the bankruptcy code because the claims were deemed property of the estate. The ruling was in response to the bankruptcy trustee's motion invoking the protection of the bankruptcy court's jurisdiction during the pendency of the bankruptcy case. In contrast, here it is not the trustee who seeks the bankruptcy court's protection, but the alter ego Defendants/Appellants themselves.[2]

The Fifth Circuit's decision in *Gibraltar Savings v. LDBrinkman Corp.* addresses facts similar to those at hand. 860 F.2d 1275 (5th Cir. 1988). In *Gibraltar Savings*, the Fifth Circuit acknowledged they had previously held, in cases such as *S.I. Acquisition*, that "'alter ego' claims are the 'property of the estate' within the meaning of the Bankruptcy Code." *Id.* at 1285. The court however distinguished the facts in *Gibraltar Savings* from those in *S.I. Acquisition. Id.* at 1285-1286. The Court stated:

> Here it is the alleged "alter ego" entity itself that challenges the creditor-plaintiff's attempt to penetrate the corporate veil. In *S.I. Acquisition*, the bankruptcy trustee sought to prohibit a creditor-plaintiff from pursuing its claim through the trustee's contempt power. Here, in contrast, the trustee's leave was obtained.
>
> An extension of *S.I. Acquisition* in [the alter ego defendant's] favor would mean that allegedly liable "alter egos" could escape liability should the trustee for a

---

[2] Additional cases cited by Appellants are similarly distinguishable. *In re Schimmelpennick* involved Dutch curators (the office of curator in a Dutch bankruptcy being the equivalent of a trustee in a United States bankruptcy) seeking to prevent a U.S. creditor from pursuing alter-ego claims against the debtor's wholly-owned subsidiary. 183 F.3d 347 (5th Cir. 1999). The court held that the alter ego claim was a general claim, and that such claim was the Curators' to enforce or not enforce. *Id.* at 361. In *In re Educators Group Health Trust*, a chapter 7 trustee filed a motion with the bankruptcy court to determine which party, the creditor or the trustee, has the authority to pursue various claims. 25 F.3d 1281 (5th Cir. 1994).

5

> "shell" corporation which it (the alleged "alter ego") has thrown into bankruptcy simply choose not to prosecute a potentially meritorious "alter ego" claim. We decline to convert the recognized shield for the debtor's estate into a shield for potentially liable "alter egos"; should the bankruptcy trustee decline the gauntlet, the veil-piercing sword is available to tort claimants or contract creditors, should they choose to attack in the bankruptcy proceeding or, with the bankruptcy court's leave, in another forum. *Id.*

Like the trustee in *Gibraltar Savings*, and unlike the trustee in *S.I. Acquisition*, the trustee in the present case "declined the gauntlet."

Appellants contend that Reis, the trustee in this case, did not decline the gauntlet because he did not "formally" abandon the veil-piercing claims. Appellants do not, however, cite any Fifth Circuit authority which requires a trustee to "formally" abandon a claim or explains how a trustee is to comply with such a requirement. The contention that Reis, at one point in time, intended to retain the veil-piercing claims is correct. Nevertheless, subsequent events confirm that Reis later abandoned those claims. Initially, Reis filed with the bankruptcy court an election to retain Nick Corp.'s veil-piercing claims. He then submitted a motion to compromise several claims, including the veil-piercing claims. The bankruptcy court rejected this compromise. Reis and the parties thereafter entered into a court-approved settlement resolving some claims, but not Nick Corp.'s fraud claims against Jim Shelton or the veil-piercing claims. The veil piercing claims as well as the fraud claims proceeded to trial in front of the bankruptcy court, where the court held that the corporate veil of JNS Aviation should be pierced to allow Nick Corp. to recover from JNS Aircraft Sales, Jim Shelton, and Malcolm Shelton.

JNS Aviation filed a motion for a new trial asserting, as in this appeal, that Nick Corp. lacked standing to bring the veil-piercing claims because such claims belonged to the bankruptcy estate. *In re JNS Aviation, LLC*, Bankruptcy No. 04-21055-RLJ-7, Adversary No. 04-2028, 2008 WL 686159, at *1 (Bankr. N.D. Tex. 2008). The bankruptcy court conducted a conference to

determine who owned the veil-piercing claims, Nick Corp. or the bankruptcy estate. *Id.* With counsel for both parties present, Reis "stated unequivocally … that he did not consider the estate to own the veil-piercing claims as they relate to Nick Corp.'s prior breach of contract claim against JNS Aviation, Inc., which, in turn, resulted in the [default] judgment it obtained in the Delaware federal court." *Id.* At that same conference, Reis stated that "the [default] judgment should *not* run in favor of the bankruptcy estate." *Id.* These statements were consistent with statements made by Reis in open court. *Id.* The bankruptcy court did not err in concluding that trustee Reis did not consider the bankruptcy estate to be the owner of the veil-piercing claims or with allowing Nick Corp. to pursue the claims.

Appellants also argue that the record is void of any evidence that the rights under the Purchase Agreement were assigned to Nick Corp. and therefore, a clear error of fact was committed when the bankruptcy court found that Nick Corp. has standing under the Purchase Agreement. The bankruptcy court identified two problems with the Purchase Agreement: (1) that the named purchaser under the Agreement was a corporation that apparently never existed and, as such, the alleged assignment was made from a nonexistent entity; and (2) that the assignment language, "agree to an assignment," suggested a future rather than present assignment. *In re JNS Aviation, LLC*, 376 B.R. at 525. Appellants do not dispute the bankruptcy court's resolution of problem one, instead focusing their briefs on the argument that there is no evidence an assignment occurred. Appellees contend there is no question that the Purchase Agreement was assigned to Nick Corp. The bankruptcy court acknowledged that the assignment instrument created an ambiguity, but concluded that the ambiguity disappeared in light of the circumstances surrounding the purchase.

Whether a contract is ambiguous is a question of law. *Thrift v. Estate of Hubbard*, 44 F.3d 348, 357 (5th Cir. 1995) (*citing Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982)). A contract is ambiguous "when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning...." *Id.* at 357-58 (quoting Towers of Tex., Inc. v. J & H Sys., Inc., 834 S.W.2d 1, 2 (Tex. 1992). "In making this determination, a court evaluates the language of the instrument in light of the surrounding circumstances existing at the time of the contract." *Id.* at 358.

Amendment 1 to the Purchase Agreement was titled "Assignment of Purchase Agreement." It was signed by Jim Shelton on behalf of JNS Aviation (seller), and Nick Lopardo on behalf of both Kahuna Partners III, LLC [3] (assignor), and Nick Corp. (assignee). The Amendment states "Seller [JNS Aviation] and Purchaser [Kahuna Partners III, LLC] agree to an assignment of the entirety of the Purchase Agreement from Kahuna Partners III, LLC to … Nick. Corp."

The title of Amendment 1, "Assignment of Purchase Agreement," shows that it was intended to be the document assigning the rights under the Agreement. While the language "agree to an assignment" could under other circumstances be construed to imply a future intent of assignment, in context it is clear that Amendment 1 was a present transfer of rights. The parties signed Amendment 1 on May 4, 2001. The plane was delivered to Nick Corp. on May 11, 2001 and Nick Corp. paid JNS Aviation the purchase price of $1,903,478. The parties entered into two subsequent amendments to the Purchase Agreement. Amendment 2, dated May 10, 2001, revised the purchase price and was signed by Jim Shelton on behalf of JNS Aviation as seller, and by Nick Lopardo on behalf of Nick Corp. *as purchaser*. Amendment 3, dated May 10, 2001, provided for an escrow holdback and was also signed by Jim Shelton on behalf of JNS

---

[3] Kahuna Partners III, LLC is the entity referenced above that was determined to be nonexistent.

Aviation as seller, and by Nick Lopardo on behalf of Nick Corp. *as purchaser*. Bill Arnwine testified that he drafted Amendment 3 with the purchaser language on behalf of JNS Aviation. Finally, Jim Shelton stated in court that he understood that Nick Corp., and not Kahuna Partners III, LLC, would be purchasing the aircraft. He also stated the following:

> Jim Shelton: The Purchaser -- whoever that might be -- and it appears to be Nick Corp. on all these other documents, and I did feel like we were dealing with Nick Corp. -- elects -- you can come back to us and elect us, JNS, the Seller, to act as agent in the negotiation and the purchase of the purchased next aircraft. What that means to me is: It is a burden upon Nick Corp. to come back to JNS and ask us -- tell us that he is ready to step up -- like he said in the past that he was going to do at some point in time -- and ask us to provide another aircraft for him. Now that is the way I feel that it is.
>
> …
>
> Appellee Attorney: And I want to just ask you about the very last couple of words you said. "Purchase another aircraft for him." When you say "him," you mean Nick Corp."
>
> Jim Shelton: Correct.
>
> Appellee Attorney: You don't mean somebody else?
>
> Jim Shelton: I don't mean somebody else, no.

All parties involved in the transaction considered Nick Corp. to be the purchaser of the aircraft and Jim Shelton considered Nick Corp. to be bound under the Repurchase Provision of the Purchase Agreement. Because the parties considered Nick Corp. to be the purchaser of the plane, it is clear that Amendment 1, the Assignment of Purchase Agreement, was intended to be a present transfer of the rights under the Purchase agreement to Nick Corp. The bankruptcy court did not err in concluding that the Purchase Agreement had been assigned to Nick Corp.

The bankruptcy court did not err in deciding that Nick Corp. had standing to sue.

## II. THE BANKRUPTCY COURT DID NOT COMMIT ERROR WHEN IT PIERCED THE CORPORATE VEIL

Appellants argue that the bankruptcy court committed error by misapplying Texas law used to pierce the corporate veil in contract claims by relying on *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986). Appellants state that the Texas Legislature overruled *Castleberry* in 1989 by amending article 2.21 of the Texas Business Corporation Act and that later amendments establish that Texas veil piercing law is exclusively statutory in contract claims. *See* TEX. BUS. ORG. CODE § 21.223. In truth, however, the legislative amendments only partially overruled *Castleberry*. The Fifth Circuit stated in *Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*:

> The amendments overruled *Castleberry* to the extent that a failure to observe corporate formalities is no longer a factor in proving the alter ego theory in contract claims. *Farr v. Sun World Sav. Ass'n,* 810 S.W.2d 294, 296 (Tex.App.1991); *Villar,* 990 F.2d at 1496 n. 8 & 1500; *Fidelity & Deposit Co.,* 976 F.2d at 275.[FN4] Thus, to pierce the corporate veil using the alter ego theory in a contract claim, the claimant must look to the remaining factors outlined in *Castleberry.*
>
> FN4. The amendments also eliminated constructive fraud as a means of piercing the corporate veil in contract claims. TEX. REV. CIV. STAT. ANN. art. 2.21 A(2) (Vernon Supp.1993). To pierce the corporate veil in contract claims, actual fraud must be proven. The amendments preserved the right to use either actual or constructive fraud to pierce the corporate veil in *tort* claims. *Farr,* 810 S.W.2d at 296.
>
> *Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994).

As utilized by the bankruptcy court in this case, there are still "three broad categories in which a court may pierce the corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." *Rimade Ltd. v. Hubbard Enterprises, Inc.*, 388 F.3d 138,

143 (5th Cir. 2004) (*citing Western Horizontal Drilling, Inc.*, 11 F.3d at 67); *see also, e.g.*, *Farr*, 810 S.W.2d at 296. "The Texas Business Corporations Act sets additional requirements for piercing the corporate veil in cases based on claims of breach of contract." *Rimade Ltd.*, 388 F.3d at 143. In a breach of contract case, "the veil may be pierced where the defendant shareholder 'caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder.'" *Id.* (*citing* TEX. BUS. CORP. ACT art. 2.21(A)(2) (now codified at TEX. BUS. ORG. CODE § 21.223)). Thus "the various doctrines for disregarding the corporate entity, including alter ego and a sham to perpetrate a fraud, are still very much alive," but these doctrines must be supported by facts showing "actual fraud." *Farr v. Sun Word Savings Association*, 810 S.W.2d 294, 296 (Tex. App. — El Paso 1991, no writ).

The bankruptcy court found that the corporate veil of JNS Aviation should be pierced under the "sham to perpetrate a fraud" theory. *In re JNS Aviation, LLC*, 376 B.R. at 530. The sham to perpetrate a fraud doctrine "is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice...." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643-44 (5th Cir. 1991) (*citing Castleberry,* 721 S.W.2d at 273). "Sham to perpetrate a fraud is an equitable doctrine, and Texas courts take a flexible fact-specific approach focusing on equity." *Id.* The variety of shams is infinite and the purpose of the doctrine "should not be thwarted by adherence to any particular theory of liability." *Id.*

The bankruptcy court found the following facts:

The corporate entities, JNS Aviation and JNS Aircraft Sales, are essentially the same company, which was, in fact, the purpose of establishing JNS Aircraft Sales. JNS Aircraft Sales has the same assets, employees, office, owners (the Sheltons), and customers as did JNS Aviation. The one distinction, of course, is that JNS Aircraft Sales did not assume the one major liability of JNS Aviation, the debt to

Nick Corp. The Sheltons and their various entities filed consolidated tax returns; the Sheltons used JNS Aviation and JNS Aircraft Sales as an investment source to obtain a higher rate of interest on loans or contributions made; there was some occurrence of the company paying for personal items of the Sheltons. Everything either company did was set in motion by the Sheltons.

…

The Court is satisfied that the overriding purpose of closing down JNS Aviation and continuing operations under JNS Aircraft Sales's [sic] shield was to isolate Nick Corp.'s Default Judgment in a worthless shell.

*In re JNS Aviation, LLC*, 376 B.R. at 529-30.

On appeal, bankruptcy court's findings of fact will be upheld unless they are clearly erroneous, while its legal conclusions are reviewed de novo. *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302-03 (5th Cir. 2007). This Court has determined these factual findings are not clearly erroneous, nor was the bankruptcy court's application of the sham to perpetrate a fraud doctrine in error.

As outlined above, the Texas Business Corporations Act set forth additional "actual fraud" requirements for piercing the corporate veil in breach of contract cases. *Rimade Ltd.*, 388 F.3d at 143. The Act states that veil piercing is only appropriate where the defendant shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder." TEX. BUS. ORG. CODE § 21.223(b). Specifically, the Bankruptcy Court here stated:

The Sheltons affirmatively elected to allow Nick Corp. to take a default judgment against JNS Aviation, which was entered on June 12, 2002. The stated reason for JNS Aircraft Sales's [sic] formation, to avoid ad valorem taxes, is not legitimate and thus not plausible. JNS Aviation did not transfer the liability under the Default Judgment to JNS Aircraft Sales. There is no evidence that the Sheltons or either JNS Aviation or JNS Aircraft Sales provided any formal notice to Nick Corp. of transfers to and formation of JNS Aircraft Sales. They simply hoped that Nick Corp. would go away along with the orchestrated demise of JNS Aviation.
…

> The purpose of the transfers of assets from JNS Aviation and ultimately to JNS Aircraft Sales was to continue the business operations unencumbered by the Default Judgment. Jim and Malcolm Shelton were the sole owners of JNS Aviation and JNS Aircraft Sales. In deciding to transfer the assets and to effect the transactions they did, they had to be acting in their own best interests. They were not looking to protect an entity or any other shareholders. No other shareholders (members) existed. They had no other interest to serve. The Court concludes that they were seeking to continue the operations for their own personal benefit. The Court concludes that this fraud issue, isolated within the context of Nick Corp.'s veilpiercing [sic] claims, must be resolved in favor of Nick Corp.

*In re JNS Aviation, LLC*, 376 B.R. at 531.

The bankruptcy court found actual fraud. The bankruptcy court did not commit error when it pierced the corporate veil of JNS Aviation.

### III. THE BANKRUPTCY COURT DID NOT COMMIT ERROR IN FINDING FRAUDULENT INDUCEMENT OR IN ITS CALCULATION OF FRAUDULENT INDUCEMENT DAMAGES

Appellants argue that the bankruptcy court committed error by finding fraudulent inducement and in its calculation of fraudulent inducement damages. Appellants argue there is no evidence of fraudulent inducement. This court will review the bankruptcy court's findings of fact under a clear error standard.

The bankruptcy court found the following: Jim Shelton knew that the Guaranteed Repurchase Provision of the contract meant that JNS Aviation would repurchase the aircraft but Nick Corp. had to *provide* JNS Aviation *the opportunity to act as Nick Corp.'s agent* if Nick Corp. decided to purchase a "follow-on" aircraft. *In re JNS Aviation, LLC*, 2008 WL 686159, at *4 (emphasis added). Shelton's "attempt to construe the provision to mean that Nick Corp. had to *purchase* a "follow-on" plane from JNS Aviation, LLC was an after-the-fact, self-serving interpretation." *Id.* (emphasis added). The Repurchase Provision was part of what induced Lopardo to enter into the Purchase Agreement. *Id.* JNS Aviation was in the same financial

13

condition before and after the sale and therefore never had funds available with which they could have repurchased the aircraft. *Id.* Jim Shelton knew, before closing, that JNS Aviation would not honor the Repurchase Provision and had a duty to disclose this information to Nick Corp. *Id.*

The elements of fraud are as follows: (i) the defendant made a material representation to the plaintiff; (ii) the representation was false; (iii) when the representation was made, the defendant either knew it was false or made it recklessly, as a positive assertion, without any knowledge of its truth; (iv) the speaker made the representation intending that the other party should act on it; (v) the plaintiff acted in reliance on the representation; and (vi) the representation caused the plaintiff injury. *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 480 (5th Cir. 2000); *see also Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). Using this standard, the bankruptcy court found that before closing, Jim Shelton and JNS Aviation included a Repurchase Provision in the aircraft sale knowing that the Provision was essential to Lopardo and knowing that JNS Aviation could not comply with the Provision. The court found further that Nick Corp. relied on the Repurchase Provision and was damaged as a result. There is no clear error in the facts found by the bankruptcy court, and, under those facts, the elements of fraud were present. The bankruptcy court did not err in finding fraudulent inducement.

Appellants also contend that the bankruptcy court committed error in its calculation of fraudulent inducement damages. This argument is addressed in Section V.

**IV. THE BANKRUPTCY COURT DID NOT COMMIT ERROR BY REFUSING TO ALLOW APPELLANTS TO ATTACK THE DELAWARE DEFAULT JUDGMENT**

Appellants argue that the bankruptcy court committed error when it held that the Delaware default judgment had *res judicata* effect on Jim Shelton and Malcolm Shelton.

14

Appellants do not contest the bankruptcy court's determination that the Sheltons were barred from relitigating the claim in their capacity as equity shareholders, but contend that they should have been allowed to attack the default judgment in their individual capacities. In support of this assertion, Appellants argue that *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 983 (5th Cir. 1990) stands for the proposition status as an equity shareholder is not enough to bar a shareholder from litigating a case previously litigated by the shareholder's company, as long as that shareholder is acting in their individual capacity and not as a shareholder. Regardless of the error in their legal interpretation of *Latham*, Appellants' reliance is misplaced given how factually different *Latham* is from the case at hand.

*Latham* involved an individual who was an equity shareholder of certain corporations that went through bankruptcy proceedings with the defendants. *Id.* at 980. In a later case brought by the individual shareholder against the defendants, the defendants sought to use the prior bankruptcy proceedings involving the corporation to raise the *res judicata* defense against the individual equity shareholder. *Id.* at 982-83. The defendants sought to bar the equity shareholder from asserting claims that, although related to the corporation, were not core to the bankruptcy proceeding and were personally held by the shareholder. *Id.* The court held that the individual shareholder's personal claims were not barred because of the previous bankruptcy proceedings with the corporation. *Id.* at 984.

Here, Jim Shelton and Malcolm Shelton do not raise any claims against Nick Corp. that are distinct from the Delaware default judgment, nor are they seeking to assert claims which they personally hold against Nick Corp. Appellants seek only to attack a judgment already rendered against the corporation of which they were shareholders. Appellants cite no authority for the proposition that, even though they purport to be acting on behalf of JNS Aviation's bankruptcy

estate, they should be allowed to attack the default judgment entered against JNS Aviation in their individual capacities.

The bankruptcy court correctly stated:

The Sheltons maintain that they act on behalf of the bankruptcy estate and thus on behalf of all creditors …. By objecting to Nick Corp.'s claim, the Sheltons can only be asserting JNS Aviation's, the debtor's, position. They literally stand in the debtor's shoes. The Sheltons have not identified any specific claim or defense *they* hold as equity security holders that would defeat Nick Corp.'s judgment.
*In re JNS Aviation, LLC*, No. 04-21055-RLJ-7 (Bankr. N.D. Tex. Aug. 10, 2005).

Appellants claim that if this Court determines that the doctrine of *res judicata* bars Jim and Malcolm Shelton from challenging the default judgment in their individual capacities, this Court must also determine that the doctrine bars Nick Corp. from piercing the corporate veil to hold Jim and Malcolm Shelton individually liable for the default judgment.

Appellants do not cite authority, and this Court finds none, necessitating a ruling that Nick Corp. is barred by *res judicata* principles from asserting veil-piercing claims to recover on a previously entered default judgment. Nick Corp., on the other hand, directs this Court to a Texas Supreme Court case involving a party who, after obtaining a judgment in their favor in a first suit, brought a second suit asserting alter ego claims in order to collect the judgment from the first suit. *See Matthews Const. Co., Inc. v. Rosen*, 796 S.W.2d 692 (Tex. 1990). The Texas Supreme Court found that the doctrine of *res judicata* would not serve as a bar to the second suit. *Id.* at 694. It is clear why this should be the rule. Assume a situation where a plaintiff sues a corporate defendant for breach of contract. The corporate defendant allows the plaintiff to obtain a default judgment against the corporation, but transfers the assets of the corporation to a separate entity, effectively preventing the plaintiff from collecting the judgment because the corporation is now bankrupt. The plaintiff, at the time of suit, had no cause to bring a veil-piercing claim and prior to obtaining the default judgment, had no awareness of the fraudulent

transfer. To hold that the plaintiff could not bring a second suit asserting veil-piercing claims to collect their judgment would protect individuals who fraudulently transfer assets from a corporation to avoid judgments against them. It would also create a catch-22 for plaintiffs in situations such as the one above. A plaintiff would be barred from bringing the second suit because the veil-piercing claim was not asserted in the first suit; however, the plaintiff could not bring the veil-piercing claim in the first suit because at that time, there was no cause to bring the claim. This would be an unjust result.

The bankruptcy court did not commit error by preventing the Appellants from re-litigating the Delaware default judgment nor does *res judicata* prevent Nick Corp. from bringing its alter ego claim in a second suit to recover the default judgment awarded.[4]

## V. THE BANKRUPTCY COURT DID NOT COMMIT ERROR IN RENDERING ITS FINAL JUDGMENT

The bankruptcy court awarded Nick Corp. damages by calculating the difference between the amount Nick Corp. paid for the aircraft and the amount it received upon sale of the aircraft; adjusting the difference by subtracting the value of Nick Corp.'s flight usage and adding monies spent by Nick Corp. to improve the plane after purchase. Appellants assert that the bankruptcy court committed error by (1) misapplying the "out-of-pocket" measure of damages and (2) adding to its judgment the monies spent to improve the plane after purchase.

The bankruptcy court relied on the out-of-pocket measure of damages, which is determined by calculating the difference between the value of what the defrauded party paid and the value of what the defrauded party received. *Leyendecker & Assocs., Inc. v. Wechter*, 683

---

[4] The bankruptcy court held that even if Appellants were not barred from attacking the default judgment, that judgment would be upheld because there was evidence that JNS Aviation breached the contract between the parties. *In re JNS Aviation*, 376 B.R. at 522. Appellants contest the bankruptcy court's finding a breach of contract. The Court does not address this issue because the bankruptcy court was correct in ruling that *res judicata* barred Appellants from attacking the default judgment.

17

S.W.2d 369, 373 (Tex. 1984). The out-of-pocket measure is calculated as of the time of sale. *Id.* Appellants contend that the bankruptcy court erred in using the amount Nick Corp. received upon its later sale of the aircraft as the value Nick Corp. received at the time JNS sold Nick Corp. the aircraft. This Court finds that the bankruptcy court did not err in calculating damages. The bankruptcy court stated it was unimpressed with both parties' expert testimony regarding the value of the plane, but found credible the testimony stating that the market for a King Air is very limited and that it can take up to years to sell such planes.[5] *In re JNS Aviation, LLC*, No. 04-21055-RLJ-7 (Bankr. N.D. Tex. May 23, 2008). The court held that no credible evidence had been offered to prove that the passage of time had diminished the base value of the aircraft. *Id.* The bankruptcy court found that Nick Corp. paid $73,000 for enhanced avionics which improved the plane. Those enhancements were reflected in the $1,000,000 price for which Nick Corp. finally sold the plane. The bankruptcy court stated:

> Nick Corp. paid $1,903,748 when it purchased the plane in May of 2001 and sold the plane in March of 2005 for $1 million. The difference is $903,748…. A proper measure of damages should reflect the benefit Nick Corp. derived from its use of the plane, as well as enhancements made to the plane by Nick Corp. Accordingly, the Court concludes that the difference of $903,748 should be reduced by the flight hours, which was 358.1 hours, multiplied by $500 per flight hour-the $500 per hour multiplier coming from the Guaranteed Repurchase Provision, which is the best evidence of the value of the benefit received by Nick Corp. Therefore, the amount of the benefit Nick Corp received from use of the

---

[5] Appellants construe the bankruptcy court's statement that the value of the Guaranteed Repurchase Provision was "simply too speculative" as a holding that the court found all evidence regarding damages too speculative. *See In re JNS Aviation*, No. 04-21055-RLJ-7 (Bankr. N.D. Tex. May 23, 2008). Appellants contend that because the bankruptcy court rejected all damage calculations, it was left with no evidence with which to calculate damages. In support, Appellants cite *Coastal Transport Co., Inc. v. Crown Central Petroleum Corp.* for the proposition that expert testimony that is conclusory or speculative is not relevant evidence and such statements cannot support a judgment. 136 S.W.3d 227, 232 (Tex. 2004). Appellants, however, misconstrue the bankruptcy court's statement. When the court addressed the value of the Guaranteed Repurchase Provision as "simply too speculative," it was not referring to the value of the entire purchase transaction, but rather the value of the right to return the aircraft if found dissatisfactory, set forth in the Guaranteed Repurchase Provision, for which Nick Corp. may have paid a sum in addition to the pure price of the plane. In compliance with the rule stated in *Coastal Transport Co., Inc.*, after determining that the value of the Guaranteed Repurchase Provision was too speculative, the bankruptcy court refrained from adjusting its damage award to reflect any such a value.

plane is $179,050. In addition, Nick Corp. paid $73,000 for enhanced avionics which improved the plane. The reduction for flight hours and the increase for the avionics are consistent with Nick Corp.'s proof of claim that is filed in this case. The resulting damage amount is $797,698.
*In re JNS Aviation, LLC*, 2008 WL 686159, at *4.

The bankruptcy court applied the proper measure of damages. There was no clear error in the calculation of damages. Even assuming, arguendo, that the amount of damages found was a mixed question of fact and law as asserted by Appellants, the Court finds that the damages amount is correct.

## CONCLUSION

For the above stated reasons, the judgment of the bankruptcy court is AFFIRMED. IT IS SO ORDERED.

Signed this 29th day of October, 2009.

**/s/MARY LOU ROBINSON**
**MARY LOU ROBINSON**
UNITED STATES DISTRICT JUDGE